Nick RATLIFF, Appellant,

v.

COMMONWEALTH OF KENTUCKY, Appellee.

No. 2004–SC–0452–MR.

Supreme Court of Kentucky.

June 15, 2006.

As Modified July 28, 2006.

Julie Namkin, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, State Capitol, Ian G. Sonego, Tami Allen Stetler, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

**Opinion of the Court by Justice Cooper**

Appellant, Nick Ratliff, was convicted by a Lawrence Circuit Court jury of intentional murder, KRS 507.020(1), for which he was sentenced to fifty years in prison, and seven counts of first-degree criminal abuse, KRS 508.100(1)(c) (torture or cruel punishment), for which he was sentenced to ten years in prison on each count.

On January 27, 2002, Tammy Kirk, Appellant's domestic companion, presented L.M., her twenty-month-old daughter by another relationship, to Three Rivers Medical Center ("Three Rivers") in Lawrence County, Kentucky. An x-ray revealed L.M. had a fractured left humerus for which no cause was stated except that she might have caught her arm in the slats of her crib. L.M. was discharged on February 1, 2002, to the care of her mother, Kirk. On February 4, 2002, L.M. was again presented to Three Rivers for treatment of crusty lesions around her mouth, belly, and on one wrist, which was diagnosed as impetigo. Treating officials also noted bruising around her lower jaw, which Kirk attributed to the sling L.M. wore for the broken arm.

Four days later, on the morning of February 8, 2002, L.M. was presented to the hospital, where, upon examination, she was pronounced dead. She was reportedly found dead in her bed at Appellant's apartment by Appellant while Kirk was asleep. During the failed resuscitation attempt at Three Rivers and the subsequent postmortem examination of L.M.'s body, a number of injuries were discovered which formed the bases for Appellant's convictions of murder and criminal abuse.

Appellant appeals his convictions and sentences to this court as a matter of right, Ky. Const. § 110(2)(b), asserting the following claims of error by the trial court: (1) denial of his motions to sever the count of murder from the counts of criminal abuse and to sever his prosecution from that of his codefendant, Kirk;

(2) denial of his motion to strike two venirepersons for cause; (3) denial of his motions for directed verdicts of acquittal with respect to all counts; (4) denial of his motion to exclude opinion testimony of Dr. Betty Spivack; (5) admission of gruesome photographs; (6) denial of his motion to merge all seven counts of criminal abuse into one count; (7) refusal to instruct the jury on lesser degrees of homicide and criminal abuse; (8) refusal to inquire into allegation of sleeping juror; and (9) errors in the amended final judgment. We affirm Appellant's convictions but vacate the judgment and remand this case to the Lawrence Circuit Court with directions to enter a new final judgment.

## I. SEVERANCE.

Appellant asserts error in the denial of his RCr 9.16 motion to sever (1) the murder count from the criminal abuse counts against him; and (2) his own criminal prosecution from the prosecution of Kirk. RCr 9.16 provides in pertinent part:

> If it appears that a defendant ... will be prejudiced by a joinder of offenses or of defendants in an indictment, ... the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires.

Under RCr 9.16, "a defendant must prove that joinder would be so prejudicial as to be 'unfair' or 'unnecessarily or unreasonably hurtful.' " *Commonwealth v. Rogers,* 698 S.W.2d 839, 840 (Ky.1985); *see also Humphrey v. Commonwealth,* 836 S.W.2d 865, 868 (Ky.1992); *Ware v. Commonwealth,* 537 S.W.2d 174, 176–77 (Ky.1976). A trial judge has broad discretion in ruling on an RCr 9.16 motion, and that determination will not be overturned on appeal unless an abuse of discretion is shown. *Taylor v. Commonwealth,* 995 S.W.2d 355, 360 (Ky.1999); *Foster v. Commonwealth,* 827 S.W.2d 670, 679–80 (Ky.1991). We review each claim separately.

### A. Severance of Charges.

Appellant argues that failure to sever the seven counts of first-degree criminal abuse from the murder count was an abuse of discretion because a finding of guilt as to the criminal abuse charges would unfairly prejudice the jury against him as to the murder charge.

A significant factor in identifying such prejudice is the extent to which evidence of one offense would be admissible in a trial of the other offense. In the case at bar, the evidence relating to the abuse charge would have been admissible in a trial on the murder charge, not, as Appellant mischaracterizes it, as proof of criminal disposition, but, rather, as proof of a similar course of conduct or common scheme or plan.

*Commonwealth v. Collins,* 933 S.W.2d 811, 816 (Ky.1996) (citations and quotation omitted); *see also Rearick v. Commonwealth,* 858 S.W.2d 185, 187 (Ky.1993). Furthermore, "the joinder of offenses ... is proper where the crimes are closely related in character, circumstances, and time." *Seay v. Commonwealth,* 609 S.W.2d 128, 130–31 (Ky.1980) (citations omitted); *see also Cannon v. Commonwealth,* 777 S.W.2d 591, 597 (Ky.1989). In the case *sub judice,* the injuries that substantiated the acts of abuse and murder were inflicted within a span of two weeks. They are similar in character and circumstance in that each occurred in either Kirk's or Appellant's apartment, and each occurred when there were no other witnesses present. Further, evidence of other assaults perpetrated by a defendant against the same victim is generally admissible to prove intent and motive with respect to the subsequent assault. *Cf. Price v. Commonwealth,* 31 S.W.3d 885,

888 & n. 4 (Ky.2000) (prior sexual assaults perpetrated against same victim admissible to prove intent, motive, and plan to commit subsequent sexual assault).

Appellant cites *Romans v. Commonwealth*, 547 S.W.2d 128, 131 (Ky.1977), for the proposition that different criminal charges should be severed when a finding of guilt as to one charge would cause the jury to be "less inclined" to believe the defendant was innocent of the other charge. However, *Romans* involved the joinder against one criminal defendant of two charges of rape involving two different victims, where the defense to one charge was consent of the victim, whom the defendant claimed was a prostitute (and the victim had been previously convicted of soliciting prostitution), whereas the defense to the other charge was alibi, *i.e.*, that he was not the perpetrator, and there was undisputed evidence that the victim had been forcibly raped by someone. *Id.* at 130–31. The coalescence of the prostitution defense, the first victim's previous conviction, and the undisputed forcible rape perpetrated against the second victim easily distinguishes the facts in *Romans* from the case *sub judice.* In this case both the victim and the defense (alibi) are identical for all joined counts.[1]

### B. Severance of Parties.

█ Appellant argues that failing to sever his trial from that of Kirk was error because Kirk blamed him as the principal actor in the abuse and murder of L.M. and, for that reason, the denial of his RCr 9.16 motion was an abuse of discretion.[2]

█ Although antagonism between the defenses of two codefendants is a relevant consideration in deciding whether to sever charges, "[t]he movant must show that the antagonism between the codefendants will mislead or confuse the jury." *Foster v. Commonwealth*, 827 S.W.2d 670, 679–80 (Ky.1991); *see also United States v. Horton*, 847 F.2d 313, 317 (6th Cir.1988).

> [N]either antagonistic defenses nor the fact that the evidence for or against one defendant incriminates the other amounts, by itself, to unfair prejudice.... That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than against a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.

*Ware*, 537 S.W.2d at 177.

Furthermore, Appellant's defense was not clearly antagonistic to Kirk's; they were actually consistent in that both affirmed throughout the trial that neither had ever harmed L.M. in any way and that neither had ever seen the other do so. The fact that an inference arises from the facts tending to inculpate Appellant (and Kirk) does not make their defenses antagonistic. *See generally Davis v. Commonwealth*, 967 S.W.2d 574, 581 (Ky.1998) (holding joinder of defendants proper where two codefendants were indicted for criminal abuse and one was indicted for homicide for death of child).

---

1. Furthermore, in *Romans* the defendant's conviction was reversed on other grounds, thus the language regarding the propriety of a severance in that case is *dictum.* *Romans*, 547 S.W.2d at 131.

2. Both Appellant and Kirk testified during their joint trial, so there was no confrontation problem as in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

## II. JURY CHALLENGES.

Appellant asserts that the trial court committed reversible error by refusing to strike three jurors for cause. RCr 9.36(1) provides that a motion to strike for cause should be granted "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence." We review a trial court's ruling on such a motion for an abuse of discretion. *Adkins v. Commonwealth,* 96 S.W.3d 779, 796 (Ky. 2003); *Pendleton v. Commonwealth,* 83 S.W.3d 522, 527 (Ky.2002).

The right to an impartial jury is a fundamental constitutional right, a violation of which may never be harmless. *Paenitz v. Commonwealth,* 820 S.W.2d 480, 481–82 (Ky.1991). A potential juror should be excused for cause only when the juror cannot conform his/her views to the requirements of law and render a fair and impartial verdict. *Mabe v. Commonwealth,* 884 S.W.2d 668, 670–71 (Ky.1994). "It is the probability of bias or prejudice that is determinative in ruling on a challenge for cause." *Pennington v. Commonwealth,* 316 S.W.2d 221, 224 (Ky.1958). The inquiry is whether the conditions behind a juror's familiarity with a party, victim, attorney, or witness are such that "their connections would probably subconsciously affect their decision of the case adversely to the defendants." *Montgomery v. Commonwealth,* 819 S.W.2d 713, 718 (Ky.1991) (quotations omitted). However, "[t]his definition does not encompass a mere social acquaintanceship in the absence of other indicia of a relationship so close as to indicate the probability of partiality." *Sholler v. Commonwealth,* 969 S.W.2d 706, 709 (Ky.1998).

During voir dire, one juror stated that Appellant's co-defendant, Kirk, had been friends with her daughter when they were younger, but that her daughter and Kirk had not had any contact for at least three years. Another juror had read about the case in the newspaper and also had taken custody of and raised a child who had been removed from an abusive household. However, the child's previous abusive relationship involved a failure to provide necessary care, *e.g.,* malnutrition, rather than physical or sexual abuse. A third juror had heard about L.M.'s death at some point but could recall neither what was said nor where he heard it. He stated that, though the fact that the victim was an infant would "impact" him "some," he felt he could be impartial and require the Commonwealth to meet its burden of proof.

Thus, all of the jurors stated that they could be impartial and consider all of the evidence. None disclosed relationships or circumstances tantamount to those from which this Court has presumed bias. *E.g., Fugate v. Commonwealth,* 993 S.W.2d 931, 938 (Ky.1999) (juror had ongoing professional relationship with counsel); *Montgomery,* 819 S.W.2d at 717 (in prosecution of prison escapee where juror had previously been held hostage by different escapees); *Ward v. Commonwealth,* 695 S.W.2d 404, 407 (Ky.1985) (juror was uncle of Commonwealth's Attorney, though not presuming bias with ex-brother-in-law or distant cousin of same); *Hayes v. Commonwealth,* 458 S.W.2d 3, 5 (Ky.1970) (juror was brother of sheriff who would testify at trial); *cf. Altman v. Allen,* 850 S.W.2d 44, 45 (Ky.1992) (bias not presumed in medical malpractice action where juror was former patient of defendant-doctor). The stated relationships or circumstances with respect to each disputed juror in this case did not so clearly imply bias that the refusal to excuse them for cause could be characterized as an abuse of discretion.

## III. SUFFICIENCY OF THE EVIDENCE.

Appellant asserts that there was insufficient evidence to establish beyond a reasonable doubt that he committed the murder and seven counts of criminal abuse, thus he was entitled to directed verdicts of acquittal on all charges.

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. . . .

On appellate review, the test of a directed verdict is, if under the evidence as a whole it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991); *see also Turner v. Commonwealth*, 153 S.W.3d 823, 826–27 (Ky.2005). The test is the same when the only evidence of guilt is circumstantial. *Bussell v. Commonwealth*, 882 S.W.2d 111, 114 (Ky.1994); *Nugent v. Commonwealth*, 639 S.W.2d 761, 763–64 (Ky.1982). Although circumstantial evidence "must do more than point the finger of suspicion," *Davis v. Commonwealth*, 795 S.W.2d 942, 945 (Ky.1990), the Commonwealth need not "rule out every hypothesis except guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 2792–93, 61 L.Ed.2d 560 (1979).

Dr. Cristin Rolf, a forensic pathologist, and Dr. Betty Spivack, a forensic pediatrician, both employed by the State Medical Examiner, testified to the cause of L.M.'s death and her other injuries. Their testimonies are summarized in the following paragraphs:

The cause of death was forcible asphyxiation, evidenced by the following injuries to L.M.: (1) the frenulum, the flap of tissue connecting the upper lip to the gum, was completely severed—a perimortem [3] injury caused by a substantial sideways shearing force applied to the lip; (2) bruises, lesions, and raw skin were visible around L.M.'s mouth, suggesting that pressure was applied to her lips; (3) lesions were visible on the sides of L.M.'s nose, which Dr. Rolf testified was an odd place for bruising on a toddler because the area was non-protruding and thus generally unlikely to become bruised from an accident; and (4) petechial hemorrhages had occurred inside the eyes. Dr. Spivack opined that L.M. was asphyxiated by an adult holding her lips and nose closed at the same time, effectively cutting off her airways to the point of suffocation. The bruising indicated where pressure was applied to L.M.'s face; the petechial hemorrhages evidenced the asphyxiation; and the severed frenulum evidenced the continued application of pressure while L.M. was struggling, probably by thrashing her head laterally in an attempt to escape the grip holding her lips together.

Dr. Rolf agreed with the diagnosis by Three Rivers (on L.M.'s February 4, 2002, visit) that impetigo caused the yellowish, crusting lesions around the mouth and on other parts of the body. However, Dr. Rolf also testified that such an infection is often "secondary"—arising from the heightened susceptibility to infection attendant to a pre-existing break in the skin. Furthermore, some of the injuries on the mouth were sustained close to the time of death, whereas others occurred at an earlier time.

---

**3.** A perimortem injury is one that occurs very near the time of death.

The medical testimony described the following additional injuries that were unrelated to the cause of death and, in the opinion of both experts, were intentionally inflicted. There were seven identical arch-shaped, scabbed burns on the abdomen, and another identical burn on the wrist, all caused by the same object being heated and forced against the skin. These were very typical of burns caused by heating a disposable BIC brand cigarette lighter and pressing the metal top against the skin.[4] Several such cigarette lighters were recovered from a search of Appellant's residence.

There were numerous bruises on the abdomen (Dr. Rolf testified to at least ten separate bruises of the abdomen; Dr. Spivack testified to "multiple" bruises) and additional extensive bruising and tearing of the mesenteric membrane inside the abdomen. There was also a hemorrhage within the bowel. These abdominal bruises, especially the interior bruising and the hemorrhage, were caused by severe blunt force trauma and were most likely sustained at different times within the four days preceding death. There were multiple contusions in the scalp on the top of the head, especially in the deep tissue of the scalp. These bruises were most probably inflicted because, unlike bruising on other parts of the body, children do not often, upon falling, land directly on the top of the head; and, if they do, usually only one large bruise appears rather than several smaller bruises (caused by repeated impacts). The bruises on L.M.'s head were likely caused by blunt force from a smaller object, roughly the size of an adult knuckle. In addition to these injuries, there were various bruises on the extremities, which could have been inflicted or accidental, and an abrasion on the back of the neck.

The fracture to L.M.'s left humerus[5] was transverse (meaning clean and straight-across) and was caused by significant force. This injury was inconsistent with one resulting from a simple fall because of the force required and because falls most often result in broken bones in the wrist or lower arm—incurred while attempting to break the fall. Dr. Spivack testified that, based on the appearance of the fractured humerus, it was caused by "bending forces"—pressure put on both sides of the bone. She explained that this kind of break rarely occurs by accident and, moreover, the information provided to Three Rivers by Kirk (that the bed had slats, L.M. was fine when she was put to bed, and her arm was broken when they found her the next day) was an unreasonable explanation. This injury occurred ten-to-fourteen days prior to death and would have been very painful when sustained. All of these injuries were sustained within a month of L.M.'s death. Some of the bruising and lesions around the mouth and nose, as well as the severed frenulum and petechial hemorrhages in the eye, were sustained at the time of death. Although L.M. was in the exclusive custody of Kirk and Appellant in the hours leading up to her death, neither claimed to have any knowledge of how the child sustained any of these injuries or what might have caused her death. Both claim she went to sleep perfectly healthy the night before she was found dead.

 Thus, the Commonwealth presented evidence that L.M., a twenty-month-old child, died from forcible asphyxiation, that

---

4. Dr. Spivack testified that the burns were almost identical to burns caused by BIC lighters to other victims, as admitted by perpetrators in other abuse cases.

5. The humerus is the long bone in the arm between the shoulder and the elbow.

this was an inflicted (rather than accidental) death, that L.M. died in the early morning hours of February 8, 2002, and that Appellant and Kirk were alone with L.M. from the preceding evening until she was presented to the hospital. Furthermore, there was additional evidence of seven other types of unexplained injuries to L.M. that were "inflicted" by someone; that Appellant had the opportunity to commit these acts of abuse; and that a BIC cigarette lighter had probably been used to inflict the burns and Appellant owned several such lighters. Appellant and Kirk agreed in their testimony that Appellant was awake for some period during the critical hours before L.M.'s death, whereas Kirk was asleep; and that Appellant was the first of the two to "discover" the body. Additionally, there was no evidence that anyone other than Appellant or Kirk had the opportunity to asphyxiate L.M., and neither Appellant nor Kirk could present any explanation as to how L.M. sustained any of her injuries. The numerous injuries sustained by L.M.—all inflicted rather than accidental—reflect an animus against the child indicative of a motive to harm her, which raises to the level of improbable Appellant's and Kirk's claimed ignorance as to the cause of *any* of L.M.'s numerous injuries.

■■■ Appellant testified in his own defense at trial. Witness credibility is distinctly within the province of the jury. *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky.2002).

> As the trier of fact, the jury was entitled to disbelieve [defendant]'s uncorroborated and confused testimony ... and to take into account [his] demeanor when testifying, which neither the Court of Appeals nor we may review. *And if the jury did disbelieve [defendant], it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt ....*

*Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992) (emphasis added) (citations omitted). The jury obviously disbelieved Appellant.

The circumstantial evidence in this case was adequate to survive Appellant's motion for directed verdicts of acquittal. *Pilon v. Commonwealth*, 544 S.W.2d 228, 230 (Ky.1976) ("[Defendant] and the mother denied that he abused the child in any way. However, the fact remains that the child was beaten to death. In view of the evidence and the inferences that may justifiably be drawn therefrom, a reasonable mind might fairly find [defendant] guilty beyond a reasonable doubt."); *see also Turner*, 153 S.W.3d at 826–27; *Davis*, 795 S.W.2d at 945–47.

## IV. OPINION TESTIMONY.

Appellant asserts that the trial court erred in allowing Dr. Spivack to opine, over Appellant's objection, that the burn injuries on L.M.'s abdomen and wrist were probably inflicted by heating a BIC cigarette lighter and pressing it against L.M.'s skin. Dr. Spivack testified that these were similar to burns she had seen on other child abuse victims that had been caused in that manner. Although she could not say which particular lighter caused the burns, she explained that BIC lighters have a particular. shape, and suspects in other child abuse cases had confessed to using BIC lighters in this manner to produce similar burns on child victims. Although Dr. Spivack could not identify animal testing or published texts on the subject of the shapes of burns caused to children by the application of hot cigarette lighters, she was familiar with published case reports of burn injuries caused to children in this manner.

■ Kentucky Rule of Evidence (KRE) 702 states:

> If scientific, technical, *or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, *experience, training, or education,* may testify thereto in the form of an opinion or otherwise.

(Emphasis added.) We review a trial court's ruling under KRE 702 for abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577–78 (Ky. 2000). Dr. Spivack is a forensic pediatrician employed by the Medical Examiner's office who has worked in the field for roughly seventeen years. She has focused on severe and fatal child abuse, published and lectured internationally, and has published and lectured on skin injuries and inflicted burns. Her qualifications are not in dispute. Rather, Appellant argues that her opinion testimony was inadmissible because none of the *Daubert* factors were satisfied, *i.e.,* whether the theory can be/has been tested, whether it has been subjected to peer review, whether there is a potential or known error rate for such tests, and whether it enjoys acceptance within the relevant scientific community. *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 592–95, 113 S.Ct. 2786, 2796–98, 125 L.Ed.2d 469 (1993).

> [T]he inquiry into reliability and relevance is a flexible one. The factors enumerated in *Daubert* and *Mitchell* [*v. Commonwealth,* 908 S.W.2d 100 (Ky. 1995)] are neither exhaustive nor exclusive. A trial court may apply any or all of these factors when determining the admissibility of any expert testimony.

*Thompson,* 11 S.W.3d at 578. The United States Supreme Court has clarified the import of the *Daubert* factors, stating:

The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert,* nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence.

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (quotations and citation omitted).

■ Although Dr. Spivack did not base her opinion on scientific testing the results of which had been subject to peer review, she explained that her opinion was supported by published case reports documenting burns inflicted by cigarette lighters and upon her own experience; she had seen the same type of burns "in actual patients and in at least two cases there was ultimately an admission that a cigarette lighter was used." The cause of an injury may be within the ambit of an expert witness's specialized knowledge and is properly admissible subject to the trial judge's KRE 702 determination. *Stringer v. Commonwealth,* 956 S.W.2d 883, 889–90 (Ky.1997). There was no abuse of discretion in the admission of Dr. Spivack's opinion testimony.

## V. PHOTOGRAPHS.

Appellant asserts that the trial court erred in admitting seventeen graphic color photographs depicting L.M.'s various injuries. Appellant argues that the photographs, especially those taken during the postmortem examination, were highly inflammatory and unduly prejudicial, and that the same evidence could have been

proven by the Commonwealth by testimony of the two physicians or by stipulation.

▮▮▮ Under KRE 401, evidence is relevant if it has any tendency to render the existence of any consequential fact more or less probable, however slight that tendency may be. *Springer v. Commonwealth*, 998 S.W.2d 439, 449 (Ky.1999); *Turner v. Commonwealth*, 914 S.W.2d 343, 346 (Ky.1996). Relevant evidence is admissible unless excluded by some other rule. KRE 402. Under KRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice ...." "The general rule is that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky.1992); *see also Holland v. Commonwealth*, 703 S.W.2d 876, 879 (Ky.1985); *Brown v. Commonwealth*, 558 S.W.2d 599, 605 (Ky.1977). An especially gruesome photograph may become inadmissible when its depictions go "far beyond demonstrating proof of a contested, relevant fact." *Holland*, 703 S.W.2d at 879.

▮▮▮ When ruling on the admissibility of a gruesome photograph, the trial court should consider whether evidentiary alternatives would sufficiently prove the fact at issue without a comparable risk of prejudice. *Old Chief v. United States*, 519 U.S. 172, 184–85, 117 S.Ct. 644, 652, 136 L.Ed.2d 574 (1997); *Norris v. Commonwealth*, 89 S.W.3d 411, 416 (Ky.2002). However, the evidence must be highly inflammatory and prejudicial to compel a party to employ evidentiary alternatives. *Adkins v. Commonwealth*, 96 S.W.3d 779, 794 (Ky.2003); *Salisbury v. Commonwealth*, 417 S.W.2d 244, 246 (Ky.1967). "Were the rule otherwise, the state would be precluded from proving the commission

of a crime that is by nature heinous and repulsive." *Salisbury*, 417 S.W.2d at 246.

▮▮ The most gruesome photographs to which Appellant objected are autopsy photographs showing either L.M.'s bowels (revealing the internal damage to L.M.'s abdomen) or L.M.'s skull with the scalp peeled away from it so as to reveal the deep-tissue bruising on the top of the head. These photographs, though indeed gruesome, do not approach instances where this Court has overturned a lower court's ruling on admission. *See, e.g., Funk*, 842 S.W.2d at 478–79 (photos of corpse with animal mutilation, substantial decomposition, and maggot infestation); *Clark v. Commonwealth*, 833 S.W.2d 793, 794–95 (Ky.1991) (up-close color slides and videotape of substantially decomposed corpse with "decompositional fluid oozing" therefrom, projected in courtroom excessively); *Holland*, 703 S.W.2d at 879–80 (photographs of corpse with extensive animal mutilation). *Compare Adkins*, 96 S.W.3d at 794–95 ("gruesome" photograph of large holes in murder victim's skull held admissible); *Foley v. Commonwealth*, 953 S.W.2d 924, 935 (Ky.1997) (photographs of burial site and corpses wrapped in quilts, roughly two years after the murder, held admissible); *City of Louisville v. Yeager*, 489 S.W.2d 819, 820–21 (Ky.1973) (color photographs of gunshot wounds held admissible); *Faught v. Commonwealth*, 467 S.W.2d 322, 325 (Ky.1970).

Although we have recognized an exception to the admissibility of an otherwise-relevant, gruesome picture when its subject matter has been altered by "extraneous causes," *Clark*, 833 S.W.2d at 794, this exception does not contemplate human manipulation necessary to present the relevant evidence. *Davis v. Commonwealth*, 967 S.W.2d 574, 579 (Ky.1998) (holding autopsy photographs of victim's brain proper means of proving fatal head injury

to infant child). In this case, the deep-tissue injuries to L.M.'s scalp and the internal bruising and hemorrhaging of her abdomen could not be proven by demonstrative evidence unless photographs were taken during the autopsy. The trial court did not abuse its discretion in admitting these photographs.

## VI. MERGER.

Appellant asserts that the trial court erred by instructing the jury on seven separate counts of first-degree criminal abuse in violation of the Fifth Amendment's proscription against double jeopardy. The Commonwealth presented medical testimony from two different medical experts regarding the nature, timing, and possible cause of the various injuries sustained by L.M.[6]

The jury instruction for each count of criminal abuse was as follows:

> You will find the defendant ... guilty of First Degree Criminal Abuse under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in Lawrence County, Kentucky, on or before February 8th, 2002, and before the finding of the indictment herein, he intentionally abused [L.M.], by [breaking her left arm];
>
> B. That he thereby caused [L.M.] to be subjected to torture or cruel punishment[;]
>
> AND
>
> C. That [L.M.] was at that time twelve (12) years of age or less.

Each of the other six instructions was identical, but identified a different injury suffered by L.M. (as in the bracketed portion of the instruction, above). Appellant argues the instructions with respect to the three impact injuries to L.M.'s abdomen (i.e., "the newest set of bruising," "the oldest set of bruising;" and "the internal injuries to her stomach (tearing of the mesentery)"), and the two instructions with respect to the burn injuries (i.e., "on the stomach;" and "on the right wrist"), improperly permitted convictions for separate injuries resulting from single criminal acts.

"The question of when an act, transaction or course of conduct shall be considered to constitute multiple offenses rather than a single offense is one on which the law is unclear, and the answer to which may vary according to a varying legislative intent." *Hennemeyer v. Commonwealth*, 580 S.W.2d 211, 214 (Ky.1979); *see also Slone v. Commonwealth*, 266 Ky. 366, 99 S.W.2d 207, 209 (1936). Although the proscriptive language in KRS 508.100(1)(c) states that the offense occurs when a defendant "intentionally abuses" and thereby "[c]auses torture, cruel confinement or cruel punishment" (language that might seem to criminalize a course of conduct rather than a single incident), abuse is defined in KRS 508.090(1) as, *inter alia,* "the infliction of physical pain, *injury,* or mental injury." (Emphasis added.) This language clearly delineates the infliction of a single injury to be a unit of prosecution, so long as its infliction was intentional, the victim was in the defendant's custody, and, *inter alia,* "torture, cruel confinement or cruel punishment" is caused thereby. *See Williams v. Commonwealth*, 178 S.W.3d 491, 495 (Ky.2005) ("The singular form of 'photograph' read in

---

6. The trial judge dismissed the count of criminal abuse premised upon the severed frenulum and the bruising around L.M.'s mouth on grounds that these injuries were part of the course of conduct that ultimately lead to L.M.'s death, *i.e.,* holding her mouth and nose closed long enough to cause asphyxiation.

conjunction with the term 'any' clearly indicates that the Legislature intended prosecution for each differing photograph.").

■ KRS 508.100 "covers situations where a person is in the custody of another and is injured by *an* abusive act of that person." *Commonwealth v. Chandler,* 722 S.W.2d 899, 901 (Ky.1987) (emphasis added). Like assault, criminal abuse is a result offense; the injury sustained by the child and the resulting torturous physical pain are among the results KRS 508.100(1)(c) proscribes. *See id.* at 901 (explaining that criminal abuse is "parallel" to assault); *Commonwealth v. Hager,* 41 S.W.3d 828, 831 (Ky.2001) (explaining that assault is a "result" offense, with bodily injury being the prohibited result).

■ In the case *sub judice,* Dr. Rolf testified that there were at least ten separate bruises to L.M.'s abdomen, and Dr. Spivack testified that the bruising resulted from multiple blunt-trauma impacts. The doctors divided the bruising into two categories distinguishable by time, some older and some more recent, indicating at least two separate occurrences of criminal abuse. The trial court instructed the jury on one count of criminal abuse related to the older bruises and another count related to the newer bruises. Appellant agrees this was proper but asserts that it was error to also instruct the jury on a separate count of criminal abuse related to the internal tearing of the mesentery, arguing that one of the blunt-force impacts that caused the external bruising must also have caused the injury to the mesentery. Appellant asserted this same argument to the trial judge, who noted that neither of the doctors testified that the injury to the mesentery must have resulted from the same impact that caused one of the external bruises.

[Y]ou can argue that this is one and tell the jury they can't find them guilty of both, if you wish, but that is an internal injury that's not specific to any particular bruises as brought out by the Commonwealth and wasn't on cross-examination associated with any of the specific areas of bruising to the abdomen ....

Appellant would have been entitled to an instruction requiring the jury to find whether the injury was caused by an act that was separate and distinct from the acts that caused the other injuries, such as that approved in *Schrimsher v. Commonwealth,* 190 S.W.3d 318, 327 n. 3 (Ky.2006). However, there was no request for such an instruction and no objection to the failure to give such an instruction. RCr 9.54(2) ("No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge ....").

The same analysis applies to the different burns found on L.M.'s body. One incident of applying a hot cigarette lighter to L.M.'s body created the prohibited result under KRS 508.100 (intentional infliction of abuse, *i.e.,* "injury" under KRS 508.090(1)), and the subsequent act of reapplying the hot cigarette lighter to a different part of L.M.'s body constituted a second instance of conduct proscribed by KRS 508.100.[7] *See Williams,* 178 S.W.3d at 495 ("[A] person who generates differing and multiple prohibited photographs ... commits multiple offenses [sic] of KRS 531.310 [use of a minor in a sexual performance], even though each such differing photograph involves the same subject captured in a narrow timeframe."); *Hennem-*

---

**7.** Under this analysis, each of the seven separate burns to L.M.'s abdomen would consti- tute a separate act of abuse.

*eyer*, 580 S.W.2d at 214 (holding that six separate gunshots fired by defendant at pursuing police over a span of fifteen minutes were six separate counts of wanton endangerment); *see also Sanchez–Rengifo v. United States*, 815 A.2d 351, 358–59 (D.C.2002) (varying sexual acts over period of two hours constitute separate criminal offenses because each represented separate criminal impulse); *State v. Soonalole*, 99 Wash.App. 207, 992 P.2d 541, 543–44 (2000) (holding two separate acts of fondling that occurred during same car ride constituted two separate "units of prosecution" for double jeopardy purposes); *State v. Rummer*, 189 W.Va. 369, 432 S.E.2d 39, 47–48 (1993) (double jeopardy not violated by conviction and punishment of two counts of sexual abuse, one for fondling victim's breasts and second for fondling victim's genitalia, within span of less than five minutes). Therefore, Appellant's convictions and punishments for separate counts of criminal abuse do not violate the proscription against double jeopardy.

## VII. JURY INSTRUCTIONS.

Appellant was convicted of intentional murder and criminal abuse in the first-degree. He asserts that the trial court erred by refusing his requested jury instructions on wanton murder, KRS 507.020(1)(b), second-degree manslaughter, KRS 507.040(1), and reckless homicide, KRS 507.050(1), as alternative or lesser-included offenses of intentional murder; and criminal abuse in the third-degree, KRS 508.120(1)(c), as a lesser-included offense of criminal abuse in the first-degree.

RCr 9.54(1) provides: "It shall be the duty of the court to instruct the jury in writing on the law of the case . . . ." Under this rule, "[a] defendant is entitled to an instruction on any lawful defense which he has. Although a lesser included offense is not a defense within the technical meaning of those terms as used in the penal code, it is, in fact and principle, a defense against the higher charge." *Slaven v. Commonwealth*, 962 S.W.2d 845, 856 (Ky.1997) (citations omitted). We review a trial court's rulings regarding instructions for an abuse of discretion. *Johnson v. Commonwealth*, 134 S.W.3d 563, 569–70 (Ky.2004).

Appellant's defense to all charges at trial was alibi; he denied having any knowledge regarding the cause of L.M.'s death and denied committing any abuse or causing harm to L.M. at any point in time. Although the defense of alibi does not preclude an instruction on mitigation or justification if the evidence supports an inference of the requisite circumstances therefor, *Commonwealth v. Collins*, 821 S.W.2d 488, 491 (Ky.1991); *Brown v. Commonwealth*, 308 Ky. 486, 214 S.W.2d 1018, 1019–20 (1948), there must be some evidence in the record to support such an inference before a trial court is required to instruct on a defense or lesser-included offense. *Taylor v. Commonwealth*, 995 S.W.2d 355, 360–61 (Ky.1999); *see also Hopper v. Evans*, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982) (holding that due process requires an instruction on a lesser included offense only "when the evidence warrants such an instruction"); *Parker v. Commonwealth*, 952 S.W.2d 209, 211–12 (Ky.1997).

Appellant requested instructions on homicide and criminal abuse offenses that require conduct that is either wanton (KRS 507.020(1)(b); KRS 507.040(1)(a)) or reckless (KRS 507.050(1); 508.120(1)(c)). However, as the trial court found, the evidence presented in this case does not support any inference of wanton or reckless conduct. As for the asphyxiation, the uncontroverted testimony of two medical experts established that L.M. would have lost consciousness one or two minutes af-

ter her airways were forcibly constricted, and that the assailant would have had to continue this act for an additional two or three minutes before L.M. ultimately died.

The two doctors testified similarly with respect to the injuries supporting each of the seven counts of criminal abuse in the first degree of which Appellant was convicted. Each count corresponded to one of the following of L.M.'s injuries: (1) the burn on her wrist; (2) the fractured humerus; (3) the older bruises on her abdomen; (4) the newer bruises on her abdomen; (5) the tearing of the mesentery; (6) the bruises on the top of her head; and (7) the burns on her abdomen. The medical testimony concluded that each of these injuries was "inflicted," not accidental. Appellant's defense to these charges was outright denial of any involvement in or knowledge of their causes. He offered no theory as to how he might have unintentionally (*i.e.*, recklessly or wantonly) inflicted these injuries.

 "Proof of intent ... may be inferred from the character and extent of the victim's injuries. Intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense." *Parker,* 952 S.W.2d at 212; *see also Davis,* 967 S.W.2d at 581 (In prosecution for criminal abuse and homicide, "[i]ntent may be inferred from the act itself and/or the circumstances surrounding it."); *Davidson v. Commonwealth,* 340 S.W.2d 243, 244 (Ky.1960). There is no evidence supporting a finding that Appellant acted wantonly or recklessly. If the jury disbelieved his alibi (that he did not abuse or kill L.M. and had no knowledge of how she was abused or killed), none of the circumstantial evidence tending to implicate him as the perpetrator—*i.e.,* Kirk

denied any involvement or knowledge, all injuries were "inflicted," he was awake and Kirk was asleep the night L.M. was killed, and no one else had access to L.M. during her last hours—suggested any theory of unintentional killing or abuse. Without some evidence suggesting facts that would permit even an inference of wanton or reckless conduct—*e.g.,* an admission that Appellant acted violently toward L.M., intending only to quiet the child but not to asphyxiate her; being rough with the child but intending only to scare or discipline her; extreme emotional distress; or intoxication negating the element of intent—an instruction on unintentional homicide or criminal abuse was not required.

The evidence presented did not support an instruction on wanton murder. Wanton murder is not a lesser-included offense of intentional murder. It is simply murder committed with a different state of mental culpability .... It is not proper to instruct the jury on a wanton offense when all the evidence indicates that it would be unreasonable for the jury to believe that the defendant's conduct was anything other than intentional. The evidence does not indicate wanton conduct.

*Foster v. Commonwealth,* 827 S.W.2d 670, 677–78 (Ky.1991) (citations and quotations omitted). *See also Parker,* 952 S.W.2d at 211–12 (holding defendant not entitled to instructions on second-degree manslaughter and reckless homicide in intentional murder prosecution because his defense was alibi and no evidence was presented to counter Commonwealth's evidence that conduct was intended); *Pilon,* 544 S.W.2d at 231 ("There is no evidence in this record which would justify the giving of a reckless-homicide instruction. After all, [the defendant] and the mother both testified that he had not touched [the victim] at any time prior to his death. Thus, there is an

absolute void in the record upon which the trial court might have justified the requested instruction."). Therefore, we find no error in the trial court's refusal to instruct on wanton murder, second-degree manslaughter, reckless homicide, or third-degree criminal abuse.

## VIII. ALLEGED SLEEPING JUROR.

Appellant filed a CR 60.02 motion for a new trial on grounds that he learned from a newspaper reporter that a juror had been sleeping during the trial. The trial judge admitted that the allegation was brought to its attention in a note from another juror, identified as the foreperson of the jury, at the conclusion of the guilt-phase closing argument but did not state what action, if any, he took in response to the note. The note is not in the record and no evidence from either the juror who wrote it or the news reporter was offered in support of the motion for a new trial.

 "[A] juror's inattentiveness is a form of juror misconduct, which may prejudice the defendant and require the granting of a new trial." *Lester v. Commonwealth*, 132 S.W.3d 857, 862 (Ky.2004). However, as a threshold matter, the aggrieved party must present *some* evidence that the juror was actually asleep or that some prejudice resulted from that fact. The record does not even disclose at what point during the trial the juror allegedly slept, whether during the Commonwealth's or the defense's presentation of evidence, or during closing argument by counsel,[8] or how Appellant was harmed by the occurrence. For a court even to entertain an objection on this basis after final judgment, a party must certainly show more than Appellant has in the case *sub judice*. *See Tanner v. United States*, 483 U.S. 107,

120–21, 107 S.Ct. 2739, 2747–48, 97 L.Ed.2d 90 (1987) ("Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.").

 Moreover, "[t]he trial judge is in the best position to determine the nature of alleged juror misconduct and the appropriate remedies for any demonstrated misconduct." *United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir.2004). Without some evidence beyond bare unsworn hearsay statements that a juror was asleep at some point during the trial, this Court is unwilling to find an abuse of discretion by the trial court. *Powell v. Louisville & N.R. Co.*, 172 Ky. 285, 189 S.W. 213, 214–15 (1916) ("[N]o objection having been made during the progress of the trial to this fact, it is evident that even if the juror did nod at some time during the trial it was not for a sufficient length of time to have attracted the attention of any one of the ... able counsel representing appellant[ ] ...."); *see also Young v. Commonwealth*, 50 S.W.3d 148, 164 (Ky.2001) (mistrial not required when juror, upon inquiry by court, denied being asleep); *Shrout v. Commonwealth*, 226 Ky. 660, 11 S.W.2d 726, 727 (1928).

## IX. ERRORS IN FINAL JUDGMENT.

Although the jury was only instructed on seven counts of criminal abuse and the jury found Appellant guilty of only those seven counts, the amended final judgment erroneously adjudged him guilty of eight counts of criminal abuse and sentenced him to ten additional years of imprisonment for the eighth count. The Commonwealth concedes the error.

---

**8.** It seems unlikely that defense counsel would not have noticed that a juror was sleeping during her own closing argument.

Appellant also asserts that the final judgment fails to state whether his sentences are to run consecutively or concurrently as required by RCr 11.04(1). If the court does not specify the manner in which a sentence is to run, it shall run concurrently with any other sentence which the defendant must serve, subject to exceptions not applicable here. KRS 532.110(2). However, Appellant concedes that at the sentencing hearing the trial judge orally expressed his intent to run the sentences consecutively "[i]nsofar as possible for a total of 120 years." We do not know whether the trial judge changed his mind or whether the omission from the judgment was a clerical error. *Cardwell v. Commonwealth*, 12 S.W.3d 672, 674 (Ky. 2000). If the omission was a clerical error and the trial judge intended to impose a sentence in excess of seventy years, the sentence violates KRS 532.110(1)(c). The judgment must be vacated insofar as it recites a conviction of and sentence for an offense of which Appellant was not convicted, and insofar as it imposes a maximum aggregate sentence in excess of seventy years.

Accordingly, Appellant's convictions are affirmed but the judgment entered pursuant to those convictions is vacated and this case is remanded to the Lawrence Circuit Court for entry of a new judgment that conforms to RCr 11.04(1) and KRS 532.110(1)(c).

All concur.