Scott Richard STANTON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2010–SC–000102–MR.

Supreme Court of Kentucky.

Sept. 22, 2011.

Julia Karol Pearson, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Julie Scott Jernigan, Assistant Attorney General, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Scott Stanton appeals as a matter of right from a Judgment of the Todd Circuit Court convicting him of first-degree rape and first-degree sodomy and sentencing him to twenty years' imprisonment. Stanton's guilty plea, in which he admitted anal intercourse with his stepson, a child under twelve years of age, was conditioned upon his right to appeal the trial court's denial of his motion to suppress two statements he gave to law enforcement officers. Stanton maintains that the officers coerced him to make the incriminating statements by representing that his two young children could be removed from the family home pursuant to a court order if he failed to cooperate with the investigation. Convinced that the trial court correctly found from the totality of the circumstances that Stanton was not coerced to make the two statements he now challenges, we affirm.

## RELEVANT FACTS

In late December 2008, Stanton's stepson, his wife's child from a former marriage, told his father that Stanton had sexually assaulted him. The father took the child to the Guthrie, Kentucky police station and informed Officer John Lancaster of the child's accusations. Officer Lancaster sought assistance from Donna Monroe, a social worker for the Department for Community Based Services. Together they interviewed the child and then drove to Stanton's brother's house, where they found Stanton, his wife, and their two children. At the insistence of the two investigators, Stanton and his family, driving in their own vehicle, followed Lancaster and Monroe to the Guthrie police station. There, the investigators first interviewed Stanton's wife and then interviewed Stanton, after having informed him of his *Miranda* rights. In the course of his interview, Stanton admitted having had sexual contact with his stepson on two occasions. At the conclusion of the interview, Officer Lancaster formally arrested Stanton, who

then spent the night in the Todd County Jail. The next day he was reminded of his *Miranda* rights and then interviewed again, this time by Officer Lancaster and Detective Ken Roberts, a child-abuse investigator for the Christian County Sheriff's Department. During that interview Stanton again admitted one of the incidents he had admitted during the first interview, but at that point he claimed to have no memory of the other.

On February 26, 2009, a Todd County grand jury indicted Stanton for one count each of rape and sodomy. About two weeks later an amended indictment was returned charging him with an additional thirty-three counts of rape, sodomy, and sexual abuse. The record does not indicate against whom these additional acts were alleged to have been perpetrated. In the meantime, Stanton had grown so despondent at the jail that he was referred to the Kentucky Correctional Psychiatric Center (KCPC) for evaluation. He was there found to suffer from bipolar disorder with psychotic tendencies and to be of low intelligence, his IQ somewhere between 73 and 82.

In September 2009, Stanton moved to suppress his two December statements. Following a suppression hearing in October 2009, the trial court denied the suppression motion, and soon thereafter, on November 20, 2009, Stanton pled guilty to one count of rape and one count of sodomy in exchange for a concurrent twenty-year sentence and the dismissal of the other charges. He conditioned his plea on being able to seek appellate review of the trial court's suppression ruling. Stanton now contends that social worker Monroe's statement that she would seek a court order for removal of Stanton's children from the family home unless he "cooperated" with her and Officer Lancaster rendered his statements involuntary and therefore inadmissible under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[1] Although statements in that vein can be threatening and coercive, the trial court correctly held in this case that Stanton's confession was not coerced.

### ANALYSIS

"[C]ertain interrogation techniques," the United States Supreme Court has held, "either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). This condemnation arises not only because we are concerned that the enforcers of the law themselves respect the law, but as importantly because we are concerned that the fundamental fairness guaranteed criminal defendants by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 11 of the Kentucky Constitution not be undermined by confessions extracted from them against their will. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Bailey v. Commonwealth,* 194 S.W.3d 296 (Ky.2006). *See also* Kentucky Revised

---

1. We note that Stanton's suppression motion did not expressly invoke the Fourteenth Amendment as a source of the rights he was claiming. The motion, however, did clearly claim that Stanton's statements were involuntary, and it cited cases delineating the Fourteenth Amendment's application to confessions. We accept, therefore, as has the Commonwealth, Stanton's Fourteenth Amendment claim as adequately preserved.

Statute (KRS) 422.110 (forbidding interrogation by "wrongful means."). Recognizing the vital and legitimate role interrogation plays in the investigation of crimes, the United States Supreme Court has sought to balance the state's interest in crime control with that of the defendant in fair proceedings by declaring inadmissible at trial only those confessions that may be deemed involuntary in that they spring not from the defendant's "essentially free and unconstrained choice," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), but rather from "coercive police activity," *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), that succeeds in overbearing the defendant's will and in "critically impair[ing]" his "capacity for self-determination." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041. Physical pressures to confess, such as violence, the threat of violence, or deprivations of food, sleep or medical attention, have been held impermissible. *Connelly*, 479 U.S. at 163–64, 107 S.Ct. 515 (collecting cases). And undue psychological pressures, such as holding suspects incommunicado for lengthy periods or subjecting them to unduly long or repeated interrogation sessions, have also been condemned. *Id.*

■ When a defendant challenges the admissibility of his confession on Fourteenth Amendment grounds, it is the Commonwealth's burden to establish by a preponderance of the evidence that the confession was voluntary. The trial court assesses that claim by considering the totality of the surrounding circumstances, including the details of the interrogation and the characteristics of the defendant, and by asking whether the confession resulted from overreaching by the interrogators or from the defendant's own properly elicited choice. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041; *Connelly*, 479 U.S. at 169–70, 107 S.Ct. 515. On appeal, we defer, absent clear error, to the trial court's findings of fact with respect to the surrounding circumstances, but we review its ultimate voluntariness determination—a question of law—*de novo*. *Cummings v. Commonwealth*, 226 S.W.3d 62 (Ky.2007) (citing *Welch v. Commonwealth*, 149 S.W.3d 407 (Ky.2004)). *And see, Miller v. Fenton*, 474 U.S. at 110, 106 S.Ct. 445 (noting that the "ultimate issue of Voluntariness' is a legal question.").

■ Stanton maintains that his interrogation was tainted by an improper threat—social worker Monroe's threat to have his children removed from their home if he did not "cooperate" with the investigation. Monroe, Officer Lancaster, and Stanton all testified at the suppression hearing, and all were in accord that at some point in the investigators' encounter with Stanton, Monroe did indeed indicate that she was prepared to "pick up the phone and call [District Court] Judge Browning for an order to remove the children." All three witnesses also testified that the remark came after Stanton initially refused to go to the police station. Monroe and Officer Lancaster testified that Monroe made the remark at Stanton's brother's house when Stanton refused to follow them to the police station. Stanton testified inconsistently. He first agreed that the remark was made at his brother's house when the investigators told him that he and his wife needed to cooperate with the investigation. The remark, he testified, greatly upset his wife, troubled him, and convinced him to submit to questioning. Later in his testimony, however, he claimed that Monroe made the removal remark not at his brother's house, but

three times during the course of his station-house interview.[2] He testified that he understood the remark regarding cooperation and the court order to mean that he was to tell the investigators what they wanted to hear, and so, to protect his children, he confessed to crimes that in fact he did not commit. In its findings, the trial court noted the discrepancy in Stanton's testimony, and though not expressly resolving it, appears to have credited Stanton's initial version, which accorded with the other testimony and tended to explain why Stanton and his wife relented and went to the police station.

Otherwise, Officer Lancaster testified that at the beginning of the first interview, which was not recorded, he informed Stanton of his *Miranda* rights and that Stanton appeared to understand them. He reminded Stanton of those rights at the beginning of the second interview, which was recorded although the recording was not made a part of the record, and again Stanton indicated that he understood. Stanton did not dispute that he was read his rights and understood them, but claimed, in effect, that he feared, at least during the first interview, that if he exercised his rights he would subject his children to removal. Officer Lancaster also testified that early in the first interview, as he was gathering biographical information, Stanton made the investigators aware that he had been sexually abused as a child and had mental health problems for which he was on medication. Stanton eventually asked that Monroe leave the room, and it

was then to Officer Lancaster alone that he made his incriminating admissions.

Monroe testified that her removal remark was not expressed as a "threat" and was not intended to "threaten" Stanton. It was meant rather to apprise him of the seriousness of the situation, a situation that included not only the stepson's allegations against Stanton, but also the child's assertion that when he told his mother what Stanton had done, she accused him of lying. Her job, Monroe testified, was to protect children such as the Stantons' two young children, one of whom could not talk. It was standard procedure, she claimed, to remove children from homes where credible allegations of sexual abuse against one child raise reasonable concerns regarding the safety of others.

The trial court accepted that explanation, and held that it was not improper for Monroe to tell Stanton what the result could be if he refused to cooperate by going to the police station to talk with the officers. Nor, in the trial court's view, did Stanton's mental deficiencies render his confessions involuntary, inasmuch as there was no evidence that the investigators sought to prey on Stanton's limitations or that those limitations prevented Stanton from understanding the *Miranda* rights which Officer Lancaster recited to him prior to questioning.[3]

▮ While it is true that properly administered *Miranda* warnings provide strong evidence that a suspect's subsequent statements were voluntary, warn-

---

**2.** Monroe was present at the beginning of Stanton's interview by Officer Lancaster.

**3.** At the suppression hearing, Stanton appeared as an articulate and effective witness. The only evidence of his mental limitations was his own discussion of his KCPC report which he had reviewed and quoted from verbatim. We make this observation simply because it is quite possible that the officers involved had no reason in the first instance to suspect that Stanton had any mental limitations.

ings alone are not conclusive. *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). As discussed above, under the Fourteenth Amendment it must appear from the circumstances in their totality, *Miranda* warnings being just one factor, that the statements did not result from the investigator's overreaching. *Mills v. Commonwealth,* 996 S.W.2d 473 (Ky.1999). One way in which investigators can overreach is to promise leniency in return for a confession or to threaten severity if a confession is withheld. Such promises and threats are generally improper, as investigators are seldom in a position to honor them or to carry them out. *United States v. Johnson,* 351 F.3d 254 (6th Cir.2003). Courts have held, however, that it is not improper for investigators to urge a suspect's cooperation by threatening the arrest of an implicated friend or family member, provided that probable cause and good faith would support the arrest. *See, e.g., Newland v. Hall,* 527 F.3d 1162 (11th Cir.2008) (threat to arrest girlfriend); *Johnson,* 351 F.3d at 263 (threat to arrest girlfriend). Similarly, in *Henson v. Commonwealth,* 20 S.W.3d 466 (Ky.1999), this Court upheld a confession induced by a threat to arrest the suspect's girlfriend, where the threat accurately represented what the police were authorized to do. If probable cause is lacking, on the other hand, then a threat to arrest someone the suspect cares about constitutes improper coercion. *United States v. Finch,* 998 F.2d 349 (6th Cir. 1993) (unfounded threat to arrest mother and girlfriend).

Notably, courts have looked more critically at investigators' threats as to a suspect's children. In *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), the United States Supreme Court overturned a state-court drug conviction on the ground that police officers' threats regarding the defendant's children coerced the defendant's confession. As the Court explained,

> the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not "cooperate." These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up."

> There was no friend or adviser to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.... We think it clear that a confession made under such circumstances must be deemed not voluntary, but coerced.

*Lynumn,* 372 U.S. at 534, 83 S.Ct. 917.

In *United States v. Tingle,* 658 F.2d 1332 (9th Cir.1981), the United States Court of Appeals for the Ninth Circuit reversed a conviction for theft from a federal credit union. Although noting that the single police officer's conduct had not been as extreme as that of the three officers in *Lynumn,* the Court nevertheless held that the defendant's confession had been coerced because the interrogating officer had

> recited a virtual litany of the maximum penalties for the crimes of which Tingle was suspected, totaling 40 years imprisonment. He expressly stated, in a manner that could only be interpreted in light of the lengthy sentences he had described, that Tingle would not see her two-year-old child "for a while." Refer-

ring specifically to her child, Sibley [the officer] warned her that she had "a lot at stake." Sibley also told Tingle that it would be in her best interest to cooperate and that her cooperation would be communicated to the prosecutor. He also told her that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed." We think it clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time.

We think it equally clear that such would be the conclusion which Tingle could reasonably be expected to draw from the agent's use of this technique.

*Tingle*, 658 F.2d at 1336.

The Supreme Court of Colorado reached a similar conclusion in *People v. Medina*, 25 P.3d 1216 (Colo.2001), a case, like this one, involving allegations of child abuse. In that case, the Court upheld the suppression of the defendant's confession, which had been induced by threats before, during, and between interviews, that absent a confession "the detective would cause the child to lose his mother and the mother, her child; and ... if he did confess, mother and child would be together, and the detective would help [the defendant] to be reunited with them." *Medina*, 25 P.3d at 1226.

As these cases indicate, when law enforcement personnel deliberately prey upon parental instincts by conjuring up dire scenarios in which a suspect's children are lost and by insinuating that the suspect's "cooperation" is the only way to prevent such consequences, the officers run a grave risk of overreaching. So powerful can parental emotions be that the deliberate manipulation of them clearly has the potential to "overbear" the suspect's will and to "critically impair" his or her capacity for "self-determination." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041. We are not persuaded that the trial court erred, however, by finding no such coercion in this case.

Monroe and Lancaster both testified that when Stanton and his wife initially refused the request to come to the police station to discuss the allegations, Monroe informed them that in the circumstances it would then be her duty, she believed, to request an order removing the two children from the home.[4] The trial court found this information was not delivered in a threatening manner but was simply an accurate statement as to the usual next step when a suspect in a child sexual abuse case declined to cooperate and children were deemed to be at risk. It may well be, as Stanton testified, that Monroe spoke forcibly and that she did not explain to the Stantons what their rights would be in the event of a temporary removal. Supposing so in no way undermines the trial court's finding that Monroe's apprising Stanton truthfully and accurately that the next step in the process could be a removal order did not "threaten" him with the loss of his children or with other consequences so dire as to overbear his capacity to choose whether to submit to questioning and whether to confess. This is so notwithstanding Stanton's bipolar disorder and his low intelligence, for, as the trial court noted, there was no evidence that the investigators sought to exploit Stanton's limitations or that those limitations

4. KRS 620.060 provides for an *ex parte* emergency custody order where removal is in the best interest of the child and one of three statutory grounds exists. *See* KRS 620.060(1)(a)–(c).

prevented Stanton from understanding the situation. Because there was neither wrongdoing by the investigators nor pressure to "cooperate" or to confess so great as to overbear Stanton's will, the trial court did not err by denying Stanton's motion to suppress his statements.

Because statements by law enforcement personnel regarding a suspect's children can be coercive, it bears emphasis that the existence of credible allegations of child sexual abuse alone will not justify immediately informing the suspect of the potential for removal of children from the home if the suspect does not cooperate. A suspect in such cases, like suspects in all criminal cases, has a Fifth Amendment right to remain silent and decline to cooperate with the investigation. However, unlike an arson or theft investigation, a child sexual abuse case entails the potential for further victimization of young children who may have no recourse for their situation absent intervention by the state. In cases such as this one where the suspect and his spouse decline to cooperate with an investigation and officials intend to seek a court order of removal, informing the suspect of the intended next step in the case is not inappropriate and coercive but simply a statement of fact. Indeed, had Stanton not been informed and the officers had proceeded before the district judge, the Stanton children could have been removed from the home without any opportunity on the part of Stanton to choose how he wished to address the very difficult situation in which he found himself and his family. The information conveyed gave Stanton the opportunity to choose and he chose to go to the police station and talk with the officers which resulted in the children remaining in the family home with their mother. That said, we emphasize that when circumstances justify informing the suspect of the officers' intended next step, the information should be conveyed in a professional manner, without threatening words or tone, because if not handled appropriately a trial court may well find that resulting statements are the product of coercion.

### *CONCLUSION*

In sum, the Fourteenth Amendment prohibits interrogation tactics calculated to overbear a suspect's will and to produce confessions involuntary in the sense that the suspect's capacity to choose has been distorted and critically impaired. The United States Supreme Court has held that threats to deprive a parent of his or her child unless the parent "cooperates" with investigators can run afoul of that prohibition. Here, however, unlike the cases in which a parent suspect has been threatened with an ultimate and speculative loss of a child and has been given to understand that "cooperation" will avert that loss, Stanton was merely informed that as matters stood the sexual abuse allegations against him would require those involved in the investigation to seek a court order separating his children from further contact with him, pending the investigation. This warning was not a speculative threat of ultimate loss of Stanton's children, but an accurate statement of what was apt to happen next in such cases, and as such it did not amount to overreaching by the state agents involved and did not pressure Stanton to such an extent as to impair his capacity to choose. Simply put, his admissions were not coerced by improper conduct. Accordingly, we affirm the February 10, 2010 Judgment of the Todd Circuit Court.

MINTON, C.J.; CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., concur. SCHRODER, J., concurs in result only.