# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: SEPTEMBER 26, 2019
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000244-MR

FINAL

DATE 10/22/19 JMF

ANTHONY BALL      APPELLANT

|  | ON APPEAL FROM JEFFERSON CIRCUIT COURT |
|---|---|
| V. | HONORABLE A.C. MCKAY CHAUVIN, JUDGE |
|  | NO. 15-CR-003365-001 |

COMMONWEALTH OF KENTUCKY      APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Jefferson County jury found Anthony Wade Ball guilty of one count of attempted murder, one count of first-degree robbery, and one count of possession of a handgun by a convicted felon. He was sentenced to twenty (20) years on the attempted murder charge; twenty (20) years on the first-degree robbery charge; and ten (10) years on the charge of possession of a handgun by a convicted felon. The court ordered the sentences to run consecutively, and they were enhanced under the persistent felony offender statute, Kentucky Revised Statute ("KRS") 532.080, to life imprisonment. This appeal followed as

a matter of right. Having reviewed the arguments of the parties, we affirm the judgment of the Jefferson Circuit Court.

## I. BACKGROUND

On October 30, 2015, Anthony Ball and Mack Matthews, both armed, robbed the 7th Street Food Mart in Louisville, Kentucky. During the robbery, Matthews approached the store owner at the checkout counter while Ball approached David Bryant, who was sweeping near the back of the store. Ball confronted Bryant, informed him that the store was being robbed, and pointed his gun at him. At this point, Bryant turned around. Ball then shot Bryant in the back of the neck. Soon after, Ball and Matthews ran from the store, having been unsuccessful in their attempts to get behind the bulletproof glass at the front counter. Surveillance video showed two men getting into a pickup truck and leaving the scene. After the pair left, the store owner called 911. Bryant survived, with significant injuries to his jaw.

On December 2, 2015, the Louisville Metro Police Department ("LMPD") issued a media release with a photo of the pickup truck taken from surveillance footage. After the media release, LMPD received a tip involving a stolen vehicle report for a truck matching that description. That truck belonged to Ball, who had reported it stolen. LMPD then began surveillance, which lead to the arrest of Ball and Matthews on December 15, 2015. That same day, Ball was interviewed by LMPD detectives after signing a waiver of his rights.

Ultimately, both Ball and Matthews were indicted for attempted murder and first-degree robbery. Ball was also indicted for possession of a handgun by a convicted felon. After a joint trial, the jury found Matthews guilty of first-degree robbery and not guilty of attempted murder. The jury found Ball guilty on all counts, and, as a persistent felony offender, his sentence was enhanced to life imprisonment. This appeal followed.

## II. ANALYSIS

Ball argues that the trial court erred when it (1) denied his motion to suppress his statements to police officers; (2) denied his motion for new counsel; (3) denied his motion to sever the attempted murder charge from the remaining charges; (4) allowed both Ball and Matthews to be tried in the same trial; (5) denied Ball's motion for recusal of the trial court judge; and (6) failed to give a renunciation instruction to the jury. We address each of these arguments in turn.

### A. The trial court did not err in denying Ball's motion to suppress.

When reviewing the denial of a motion to suppress, "we defer to the trial court's factual findings if they are supported by substantial evidence and only review such findings for clear error." *Bond v. Commonwealth*, 453 S.W.3d 729, 732 (Ky. 2015) (citing Rule of Criminal Procedure ("RCr") 9.78[1]; *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky. App. 2002)). For example, "[w]hen the trial court is faced with conflicting testimony regarding the voluntariness of a confession, its determination, including its evaluation of credibility, if

---

[1] The current version of RCr 9.78 is now RCr 8.27.

3

supported by substantial evidence, is conclusive." *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky. 1999). We then review the trial court's application of the law to the facts *de novo*. *Id.* (citing *Roberson v. Commonwealth*, 185 S.W.3d 634, 637 (Ky. 2006)).

Specifically, in this case, we must determine whether Ball made a knowing, intelligent, and voluntary waiver of his constitutional rights, or whether, as he argues, his confession resulted from coercive police activity. In determining whether a confession was coerced, the reviewing court must consider "(1) whether the police activity was 'objectively coercive'; (2) whether the coercion overbore the will of the defendant; and (3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession." *Bailey v. Commonwealth*, 194 S.W.3d 296, 300 (Ky. 2006) (quoting *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky. 1999)). The Court must consider "the totality of the circumstances surrounding the making of the confession" when evaluating these factors. *Id.* (quoting *Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky. 1999), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010)).

In the present case, Ball, through counsel, filed a motion to suppress the statements he made to police after his arrest on December 15, 2015. In the motion, Ball alleged that his *Miranda*[2] waiver and the confession that followed were made under duress and as a result of coercion from law enforcement

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

officers. More specifically, Ball alleged that the officers "primed" him prior to his interrogation and impliedly threatened harm to Ball and his family.

The trial court denied Ball's motion. The court found Ball's testimony[3] "to be self-serving and wholly unsupported by the evidence." It also found "Ball's testimony as to the facts to be the product of contrivance, dishonesty, and objectively unreasonable misapprehension all in a misinformed and misguided effort to create issues of law which could lead to the suppression of his statement." Simply put, the trial court found Ball's testimony to be incredible. It also found that "[t]he tone, tenor, and content of his extended and extensive statement to the police belie[d] his assertion of coercion." Furthermore, the court found no connection between the officer's alleged threat and the statements made by Ball. Accordingly, the trial court denied the motion to suppress, holding that the police conduct was lawful and not coercive and that Ball's statements were therefore voluntary.

On appeal, Ball first points out that he was not immediately *Mirandized* upon arrest. However, the law does not require that a suspect be *Mirandized* prior to or immediately after arrest; it only requires that the suspect be *Mirandized* prior to a custodial interrogation. At Ball's suppression hearing, he

---

[3] Ball testified on January 29, 2018, the second day of his suppression hearing. The recording of that day's testimony was initially omitted from the record, and as a result, a supplemental recording was filed purporting to provide the January 29th recording. However, that supplemental filing included only the recording for January 26, 2019, the first day of the hearing. The Commonwealth sought to supplement the record again, and a certified copy of the January 29, 2018 recording was then provided to this Court on August 8, 2019.

testified that he was *Mirandized* before being transported to LMPD[4] and was re-read those rights after he arrived at LMPD. He does not argue to this Court that a custodial interrogation took place prior to either *Miranda* warning being given. Furthermore, the Commonwealth did not seek to introduce at trial any statements made prior to the formal interrogation at LMPD. Nevertheless, Ball argues that, prior to being formally interrogated at the police department, the detectives "primed" him for interrogation by threatening the safety of his parents.

Ball discussed this allegedly coercive conversation at his suppression hearing. He testified that Detective Smith *Mirandized* him at some point after his arrest but prior to being transported to LMPD offices. According to Ball's testimony, he verbally acknowledged his *Miranda* rights and said that he wanted a lawyer and wished to remain silent, at which point Detective Smith stated his belief that Ball had hidden evidence at his parents' home in Palmyra, Indiana and SWAT might have to execute a search warrant there.[5] Ball testified that Detective Smith told him that the SWAT team responsible for executing that warrant would be "going in blind" and did not know how many guns or people were on the property, so "if anything bad happened," it would be Ball's fault. He also testified that Detective Smith asked Ball if his father owned any weapons. According to Ball, he responded that his dad had two

---

[4] When questioned by Ball at the suppression hearing, Detective Smith did not recall *Mirandizing* Ball at the arrest site.

[5] Ball does not argue on appeal that Detective Smith improperly interrogated him after he requested a lawyer.

guns, probably for hunting varmints, and Detective Smith asked whether there would be a shootout with Ball's father. Ball claimed that he took these statements as a threat and felt compelled to sign a written waiver of his rights once he arrived at LMPD.

Detective Smith, on the other hand, testified that he could not recall the exact conversation that took place at the arrest site, but he believed it would typically consist of small talk, "general conversation," or answering Ball's questions. During the interrogation, he also referred to a pre-interrogation "general conversation" and specifically mentioned talking to Ball about finding his dog, which ran off when the police arrived. Ball disputes this by pointing to a single line from the audio recording of his interrogation, in which a detective commented that they were discussing confessions prior to the interrogation. The detective stated, "I told you before we sat down, when we sat down here, we told you and you asked and we were talking about confessions, right, we sat there and told you we got, we don't need confessions on this stuff." Ball relies on this line to argue that the detectives must have discussed more than general conversation prior to the interrogation and that he was therefore "primed" for the interrogation. However, this single statement could be equally indicative of the detectives' willingness to answer Ball's own questions about confessions. It could also reference the involvement of others, including Matthews, and the detectives' belief that they did not need confessions from those individuals. Likely, it was a reference to the detectives' comments at the beginning of the interrogation. The detectives had explained that they knew what Ball had been

7

doing the previous day and they had some information about his involvement in several robberies, but they wanted to clarify his role in those crimes. In other words, they did not need a confession to tie him to the crimes, but they wanted more information, if possible. The comment provides no indication that any detective referenced Ball's parents prior to the interrogation, and it certainly does not indicate that a threatening conversation took place. Without more, this statement does not suggest that the detectives made coercive threats or comments prior to the interrogation.

Ball next alleges that Detective Smith falsely testified that he never threatened to send a SWAT team to Ball's parents' home. To be clear, Detective Smith denied threatening Ball's family; he did not deny making any references to searching the home of Ball's parents during the interrogation. Rather, he testified that his focus was on recovering evidence that he believed Ball had hidden at his parents' home. In that context, Detective Smith commented that Ball's willingness to work with the detectives would likely save them a trip to his parents' house. Other statements made by Detective Hollis similarly referenced a search of Ball's parents' home. However, Detective Hollis's testimony made clear that such statements were to ensure the safety of the parents and police. For example, he asked whether Ball's father owned any weapons and how he might react if police officers arrived at his home. Though Ball became adamant during the interrogation that such statements were threatening, Detective Hollis explained to him that they were not threats. On

8

this point, it is important to note that many of these comments were made *after* Ball confessed to shooting Bryant.[6]

To the extent the detectives' statements conflict with Ball's testimony, we defer to the trial court's evaluation of the witnesses' credibility. As we have previously explained, the trial court's evaluation of credibility is conclusive so long as it is supported by substantial evidence. *Henson,* 20 S.W.3d at 469 (citations omitted). Having reviewed the testimony presented by each suppression hearing witness, including Ball, we conclude that the trial court's determination that Ball lacked credibility is supported by substantial evidence.

Furthermore, having reviewed the interrogation tape and the totality of the circumstances surrounding these statements, we cannot find that the statements at issue were coercive. This Court has previously held that investigators may "urge a suspect's cooperation by threatening the arrest of an implicated friend or family member, provided that probable cause and good faith would support that arrest." *Stanton v. Commonwealth,* 349 S.W.3d 914, 919 (Ky. 2011) (citations omitted). For example, in *Henson* we upheld the defendant's confession despite the investigator's threat to arrest the defendant's girlfriend because the police were authorized to make that arrest. 20 S.W.3d 466. We found that defendant's claims of coercion were unpersuasive, explaining, "[Henson] claims his confession was coerced, and

---

[6] At his suppression hearing, Ball lists the time-stamps for 18 allegedly threatening comments made during the interrogation. Ball confessed to shooting Bryant approximately half-way through the approximately seven-hour interrogation. Eleven of the allegedly threatening comments were made well after this confession, with most occurring in the last hour of the interrogation.

therefore involuntary, because he felt threatened by a true statement of fact. . . . However, there were no offensive practices or oppressive conduct by the police officer," such as prolonged detention, repeated rounds of interrogation, or physical abuse. *Id.* at 469–470.

We have also found that a suspect may be informed of the potential removal of his children from the family home when that comment is "an accurate statement of what was apt to happen next in such cases." *Stanton,* 349 S.W.3d at 921. For example, in *Stanton,* the suspect's social worker "indicate[d] that she was prepared to 'pick up the phone and call [the judge] for an order to remove the children.'" *Id.* at 917. Stanton claimed that he was coerced by this statement into cooperating with police and confessing to crimes he did not commit. The social worker later testified that her comment was not intended as a threat. Rather, "[i]t was meant to apprise him of the seriousness of the situation," as the process of removal would have been standard procedure in that case, which involved allegations of sexual abuse. The trial court ultimately concluded that the removal information "was not delivered in a threatening manner," even if it was said forcibly; instead, it "was simply an accurate statement of the usual next step." *Id.* at 920. We affirmed, noting that

> [t]his warning was not a speculative threat of ultimate loss of Stanton's children, but an accurate statement of what was apt to happen next in such cases, and as such it did not amount to overreaching by the state agents involved and did not pressure Stanton to such an extent as to impair his capacity to choose.

*Id.* at 921.

10

We reach a similar conclusion here. The statements regarding the potential search of Ball's parents' home were accurate representations of the steps the detectives could have taken, and likely would have needed to take, in order to collect additional evidence. For example, according to Ball's own testimony, Detective Smith stated that he had surveyed Ball travelling to his parents' home the night before and believed he left certain evidence there, namely, a white Cadillac used in another crime.[7] Detective Smith likely would have relied on that surveillance to obtain a search warrant for Ball's parents' home. Furthermore, some of the detectives' statements, such as their inquiries into the father's ownership of weapons, stemmed from valid concerns for the safety of the parents and the officers. Though Ball claims that he found such statements threatening, we agree with the trial court's finding that Ball lacked credibility. More importantly, the statements must be *objectively* coercive. *Bailey*, 194 S.W.3d at 300. The detectives provided credible testimony that they did not intend to threaten Ball and instead had valid reasons for making the statements at issue. They spoke calmly and cordially with Ball. There is no evidence that their statements were accompanied by oppressive interrogation tactics, like physical abuse or prolonged confinement.[8] In fact, they provided food and water, allowed Ball to take several bathroom breaks, and purchased rolling tobacco for Ball at his request. For these reasons, we

---

[7] During Ball's interrogation, he was questioned on his involvement in several other robberies.

[8] Ball's interrogation lasted approximately seven hours. However, as noted at the suppression hearing, that duration can be attributed primarily to Ball's own willingness to talk.

11

find that the statements at issue were not objectively coercive and were instead accurate representations "of what was apt to happen next in such cases, and as such [they] did not amount to overreaching by the state agents involved and did not pressure [Ball] to such an extent as to impair his capacity to choose." *Id.*

Next, Ball argues that the detectives violated LMPD's internal procedures by permitting more than two interrogators to actively participate in an interrogation without first obtaining a written waiver from the suspect. Detective Smith admitted that three detectives actively participated in at least one part of the interrogation. This Court acknowledges that three officers may be more intimidating than two; however, the Court does not find that, under the facts of this case, the mere presence of the three officers, without more, is sufficient to demonstrate coercion. Beyond Ball's incredible testimony, there is nothing in the record to suggest that the presence of an additional detective overbore Ball's will or was a crucial motivating factor in his confession. In fact, the detectives testified that, at one point, two of the three detectives left the room because they felt that Ball wanted them to leave.

Lastly, Ball argues that he was not permitted to ask the detectives about KRS 422.110 during trial. That statute states, in full,

> No peace officer, or other person having lawful custody of any person charged with crime, shall attempt to obtain information from the accused concerning his connection with or knowledge of crime by plying him with questions, or extort information to be used against him on his trial by threats or other wrongful means, nor shall the person having custody of the accused permit any other person to do so.

12

Ball briefly referenced this "sweating" statute during his suppression hearing, and the Commonwealth did not object. Whether he was able to again reference the statute while questioning the detectives at trial is irrelevant to our review of the denial of Ball's Motion to Suppress.

For the reasons set forth above, we find that the trial court's findings of fact are supported by substantial evidence in the record, and its application of the law to those facts is without error. Accordingly, we affirm the trial court's denial of the motion to suppress.

## B. The trial court did not err in denying Ball's Motion to Request New Counsel.

An indigent defendant represented by a public defender or appointed counsel "does not have a constitutional right to be represented by any particular attorney, and is not entitled to the dismissal of his counsel and the appointment of substitute counsel except for adequate reasons or a clear abuse by counsel." *Henderson v. Commonwealth*, 563 S.W.3d 651, 668 (Ky. 2018) (citing *Henderson v. Commonwealth*, 636 S.W.2d 648, 651 (Ky. 1982)). Thus, "[w]hen an indigent defendant seeks to change his appointed counsel, he carries the burden of demonstrating to the court that there exists []good cause." *Id.* (quoting *Stinnett v. Commonwealth*, 364 S.W.3d 70, 81 (Ky. 2011)) (internal quotation marks omitted). Good cause has been described as "(1) a complete breakdown of communications between counsel and defendant; (2) a conflict of interest; and (3) where the legitimate interests of the defendant are being prejudiced." *Stinnett*, 364 S.W.3d at 81 (quoting *Deno v. Commonwealth*, 177 S.W.3d 753, 759 (Ky. 2005)) (internal quotation marks omitted). It must

13

be more than "mere dissatisfaction with appointed counsel's performance." *Id.* at 81. Ultimately, the decision rests within the sound discretion of the trial court. *Henderson,* 563 S.W.3d at 669 (citing *Pillersdorf v. Dept. of Public Advocacy,* 890 S.W.2d 616, 621 (Ky. 1994)).

Here, Ball sought new counsel because, according to Ball, his appointed counsel refused to respond to his correspondence and ignored his requests to file certain motions. Ball also alleged that his counsel created a conflict of interest by "argu[ing] against claims made by" Ball, such as his request for an expert in digital audio recordings. Lastly, Ball argued that his interests were prejudiced because his attorney had failed to find and interview witnesses at Ball's request and "erroneously declaring those witnesses to be inadmissible." Based on these assertions, Ball argued that there had been a complete breakdown in communication, a conflict of interest, and that his counsel created a situation prejudicing his legitimate interests.

Ball's stated reasons, however, do not constitute good cause as defined in this Court's precedent. First, there is no evidence that Ball's counsel refused to respond to his correspondence to the point that a complete breakdown of communication occurred. In fact, the record contains correspondence between Ball and his counsel in which counsel provided a detailed explanation of the available discovery documents and the need to discuss Ball's defense theories at an upcoming meeting. Ball is also seen conversing with counsel during various pretrial proceedings. In addition, we note that an attorney need not defer to his or her client on the means

14

necessary to achieve the client's objectives. *See* Supreme Court Rule ("SCR") 3.130. In other words, while Ball's appointed counsel was required to defer to Ball's overarching objectives and *consult* with him about the means to achieve those objectives, she was not obligated to interview specific witnesses or file the specific motions he requested, particularly if she found them to be frivolous or lacking factual support. Furthermore, Ball's request to represent himself as "hybrid counsel" was granted, permitting him to file motions and otherwise participate in his own trial as counsel. Accordingly, we cannot find that his appointed counsel created a situation in which Ball's legitimate interests were prejudiced. For these reasons, we find that the trial court did not abuse its discretion in denying Ball's Motion to Request New Counsel, and we affirm the trial court's ruling on said motion.

### C. The trial court did not err in denying Ball's motion to sever the attempted murder charge.

Under RCr 6.18, multiple charges may be brought in a single indictment so long as the charges "are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." However, under RCr 8.31, if it appears that the defendant will be prejudiced by joining the offenses for trial, "the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires." This Court has further clarified that a defendant requesting severance must "prove that joinder would be so prejudicial as to be unfair or unnecessarily or unreasonably hurtful." *Elam v. Commonwealth*, 500 S.W.3d 818, 822 (Ky. 2016) (quoting *Ratliff v. Commonwealth*, 194 S.W.3d 258, 264 (Ky. 2006))

(internal quotation marks omitted). Furthermore, on appeal, it must be clear "that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge that the refusal to grant a severance was an abuse of discretion." *Id.* (quoting *Murray v. Commonwealth*, 399 S.W.3d 398, 405 (Ky. 2013)) (internal quotation marks omitted). Thus, a trial court's denial of such a request will be upheld "absent a showing of actual prejudice and a clear abuse of discretion." *Id.* at 822–23 (quoting *Murray*, 399 S.W.3d at 405) (internal quotation marks omitted).

The present case involves an attempted murder charge and a robbery charge stemming from the same transaction, namely, the October 30, 2015 incident at the 7th Street Food Mart. Ball does not allege that the two charges were improperly joined in the indictment. Instead, Ball, through counsel, filed a motion to sever the attempted murder charge from the robbery charge and conduct separate trials on each because he wanted to testify regarding one, but not both, charges. The motion was addressed on the first day of the trial, February 26, 2018. Ball declined to orally argue the motion at that time, saying only that he wanted to testify for one charge, but not both. The trial court orally denied this request, noting that the charges were properly joined and there was nothing in the record indicating prejudice. The trial court explained that Ball could not create the prejudice by seeking to testify to only one charge. Ball now alleges that, due to the trial court's denial of his request, he declined to testify at trial, thereby suffering prejudice.

16

We agree with the trial court's analysis. These charges stem from the same transaction and were properly joined for trial. The only suggestion of prejudice is Ball's own decision not to testify. He was not prevented from testifying at trial, but instead made a strategic decision to avoid examination on one charge by declining to testify to either charge. Based on these circumstances, we cannot find actual prejudice or a clear abuse of discretion. Accordingly, we affirm the trial court's denial of Ball's motion to sever the attempted murder charge from the robbery charge.

### D. The trial court did not err in trying both defendants in the same trial.

Under RCr 6.20, two or more defendants may be jointly tried if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." However, as noted above, RCr 8.31 directs the trial court to "grant separate trials of defendants or provide whatever other relief justice requires" if it appears that a defendant will be prejudiced by a joint trial. Thus, to warrant severance, a joint trial must be so prejudicial as to be "unnecessarily or unreasonably hurtful." *Elam*, 500 S.W.3d at 822 (quoting *Ratliff*, 194 S.W.3d at 264) (internal quotation marks omitted). This Court has explained, however, that "[n]either antagonistic defenses nor the fact that the evidence for or against one defendant incriminates the other amounts, by itself, to unfair prejudice." *Ratliff*, 194 S.W.3d at 265 (quoting *Ware v. Commonwealth*, 537 S.W.2d 174, 177 (Ky. 1976), *overruled on other grounds as recognized by Webb v. Commonwealth*,

2017 WL 5504420 (Ky. March 23, 2017)). As explained above, a trial court's denial of such a request will be upheld "absent a showing of actual prejudice and a clear abuse of discretion." *Id.* at 822–23 (quoting *Murray,* 399 S.W.3d at 405) (internal quotation marks omitted).

In the present case, Ball, through counsel, filed a Motion for Separate Trial from Co-Defendant Mack Matthews. Matthews filed a similar motion. By Order entered January 11, 2018, the court addressed both motions. In that order, the trial court found that it was "certainly possible in the instant case to redact the Defendants' statements so as to exclude any portion of same which either directly or implicitly references to each [sic] other. It is therefore possible for the Commonwealth to introduce the Defendants' statements without prejudice to each other." Accordingly, the trial court held the motions in abeyance, permitting the parties an opportunity to discuss the manner in which the statements could be redacted. By Order entered February 14, 2018, the Court denied the motions, "[i]nsofar as the statements made by the Defendants have been redacted so as to remove any potential conflict between their respective 5th and 6th Amendment rights."

The trial court found support for its decision in *Bruton v. United States,* 391 U.S. 123 (1968) and *Richardson v. Marsh,* 481 U.S. 200 (1987). We agree that, under *Bruton, Richardson,* and their progeny, it was appropriate to redact the defendants' statements and continue with a joint trial. Those cases establish the general rule that a defendant's prior statements may be introduced at a joint trial, even if the defendant refuses to testify and the

18

statements implicate his co-defendant, so long as appropriate redactions are made and a limiting instruction is provided. By making these redactions and properly instructing the jury, the co-defendant is no longer implicated in the statements and his Sixth Amendment confrontation rights are no longer at issue.

It is important to note that Ball does not argue that any portion of Mathew's statements were improperly redacted or otherwise incriminated Ball or that the jury was improperly instructed on this issue. Instead, Ball argues that the redaction requirement forced Ball to forgo presentation of certain portions of his own interrogation. He argues that this fundamentally altered his defense and his approach to questioning witnesses. Ball makes this argument without referencing any specific portions of his statement that he wished to present, nor does he explain how the redaction of Matthews's identity prevented him from submitting substantive portions of his statement. Without this information, we cannot find that "joinder would be so prejudicial as to be unfair or unnecessarily or unreasonably hurtful." *Elam*, 500 S.W.3d at 822 (quoting *Ratliff*, 194 S.W.3d at 264) (internal quotation marks omitted). Accordingly, absent a finding of actual prejudice and a clear abuse of discretion, we must affirm the trial court's denial of Ball's Motion for Separate Trial.

**E. The trial court did not err in denying Ball's motion for recusal.**

KRS 26A.015(2)(a) and (e) provide that a judge shall disqualify himself in any proceeding "[w]here he has a personal bias or prejudice concerning a party,

19

or personal knowledge of disputed evidentiary facts concerning the proceedings, or has expressed an opinion concerning the merits of the proceeding" or "[w]here he has knowledge of any other circumstances in which his impartiality might reasonably be questioned."[9] The burden rests on the moving party to demonstrate the necessity of recusal, and the burden "is an onerous one." *Stopher v. Commonwealth*, 57 S.W.3d 787, 794 (Ky. 2001). For example, "[t]here must be a showing of facts 'of a character calculated seriously to impair the judge's impartiality and sway his judgment.'" *Id.* (quoting *Foster v. Commonwealth*, 348 S.W.2d 759, 760 (1961)) (internal quotation marks omitted). Thus, "[t]he mere belief that the judge will not afford a fair and impartial trial is not sufficient grounds for recusal." *Id.* (citing *Webb v. Commonwealth*, 904 S.W.2d 226 (Ky. 1995)). On appeal, we review the trial court's decision on a motion to recuse for an abuse of discretion. *Minks v. Commonwealth*, 427 S.W.3d 802, 806 (Ky. 2014) (citing *Hodge v. Commonwealth*, 68 S.W.3d 338, 345–46 (Ky. 2001); *Sommers v. Commonwealth*, 843 S.W.2d 879, 880–82 (Ky. 1992)).

In the present case, Ball, acting as hybrid counsel, filed a Motion Requesting to Recuse Judge, in which he argued that certain comments by the trial court judge demonstrated the judge's personal bias. The trial court denied the motion, "[i]nsofar as there is no basis in fact to suggest that the undersigned's impartiality might reasonably be questioned or that the

---

[9] This same statute also mandates recusal in other situations, such as where the judge has a pecuniary or proprietary interest in the outcome of the proceeding, but those provisions are not at issue in this case.

20

undersigned has a personal bias or prejudice concerning the Defendant or his lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding."

Having reviewed the record and the trial judge's allegedly prejudicial comments, we cannot find that Ball satisfied the onerous burden of demonstrating bias or prejudice. For example, Ball references a comment made on February 16, 2018 during a pretrial conference. On that date, Ball declined to waive any potential conflict of interest arising from the fact that both defendants were represented by public defenders. Judge Chauvin appeared concerned that Ball had received bad advice from a jail mate, noting that sometimes people in jail "say stupid things." However, he repeatedly told Ball that it was "okay" if he declined to waive the conflict of interest, and he explained that he could not tell Ball what to do. Similarly, at trial, Judge Chauvin allowed Ball to ask a detective about alleged violations of LMPD procedures, but he warned Ball that its relevance was limited and "the further afield you go . . . the goofier it makes you look." This conversation took place during a bench conference after Ball's own attorney interrupted Ball's questioning to voice her concern that the jury was "getting a very bad impression" of Ball. Judge Chauvin ultimately allowed Ball to pursue this line of questioning.

These comments do not rise to the level of prejudice necessary to warrant recusal. In fact, having reviewed the record, we note that the Judge Chauvin treated Ball respectfully, and he patiently guided him through the pretrial

21

proceedings and trial. Accordingly, we will affirm the trial court's denial of Ball's Motion Requesting to Recuse Judge.

## F. The trial court did not err when it declined to give a renunciation instruction.

We review the trial court's refusal to give a specific jury instruction for an abuse of discretion. *Sargent v. Schaffer*, 467 S.W.3d 198, 204 (Ky. 2015). In doing so, we note that a trial court is under no obligation to instruct the jury on a theory that is unsupported by the evidence. *Thompkins v. Commonwealth*, 54 S.W.3d 147, 151 (Ky. 2001) (citing *Houston v. Commonwealth*, 975 S.W.2d 925 (Ky. 1998)). When considering whether the theory was supported by the evidence, the reviewing court "must consider the evidence in the light most favorable to" the requesting party. *Thomas v. Commonwealth*, 170 S.W.3d 343, 347 (Ky. 2005) (citing *Ruehl v. Houchin*, 387 S.W.2d 597, 599 (Ky. 1965)).

In the present case, Ball wanted to include a renunciation, or abandonment, instruction on his attempted murder charge pursuant to KRS 506.020. Under that provision, a defendant charged with attempt to commit a crime may present a defense that "under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant abandoned his effort to commit the crime and, if mere abandonment was insufficient to avoid the commission of the crime, took the necessary affirmative steps to prevent its commission." KRS 506.020(1).

Ball argued that he was entitled to the instruction because he presented evidence that he left the store after shooting Bryant. In other words, Ball

22

argues that he abandoned the attempt to murder Bryant because he left without taking any additional steps to ensure that Bryant actually died, thereby allowing Bryant to receive life-saving medical assistance. There is no evidence, however, that he made any efforts to abandon his commission of the crime or took any steps to avoid its commission *prior* to shooting. He shot Bryant in the neck, left him in the back of the store, and attempted to get behind the bulletproof glass at the front counter. When he and Matthews failed to do so, they fled. Leaving the store *after* the crime does not constitute abandonment, as the crime—the shooting of Bryant—had already taken place. Simply put, even considering the evidence in the light most favorable to Ball, there is no evidence that he either abandoned his efforts to commit the crime or took the necessary steps to prevent its commission. There was no factual issue to present to the jury, and therefore, the trial court did not abuse its discretion in declining to give a renunciation instruction. Accordingly, we affirm the trial court's ruling on this issue.

### G. Cumulative Error

We find no error and, as a result, Ball's cumulative error argument is without merit. *McQueen v. Commonwealth*, 721 S.W.2d 694, 701 (Ky.1986) ("In view of the fact that the individual allegations have no merit, they can have no cumulative value.").

23

## III.  CONCLUSION

For the reasons set forth above, we hereby affirm the judgment of the Jefferson Circuit Court.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

James Coleman Shackelford
Assistant Attorney General